UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Four D, Inc.,

Plaintiff,

v.

Civil No. 01-2073 (RHK/AJB)
**MEMORANDUM OPINION AND ORDER**

Dutchland Plastics Corp.,

Defendant.

---

Eric J. Nystrom and Christopher H. Yetka, Lindquist & Vennum, P.L.L.P, Minneapolis, Minnesota, for Plaintiff.

William P. Te Winkle, Rohde/Dales L.L.P., Sheboygan, Wisconsin; David A. Orenstein and Kevin R. Coan, Parsinen Kaplan Rosberg & Gotlieb, P.A., Minneapolis, Minnesota, for Defendant.

---

## Introduction

This matter comes before the Court on Defendant Dutchland Plastics Corp.'s ("Dutchland") Motion for Partial Summary Judgment. Plaintiff Four D, Inc. ("Four D"), a seller of molded plastic products, sued Dutchland, a manufacturer of such products, alleging that manufacturing defects in the "Shop-Along II Child Carrier" ("SAII") caused Home Depot, Inc. ("Home Depot") to withdraw from an agreement to place the SAII in its stores nationwide. Dutchland has counterclaimed against Four D for various unpaid balances. Dutchland has now moved for partial summary judgment on (1) Four D's claim

FILED APR 0 8 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

for lost profits, (2) Four D's claim for its costs in purchasing additional SAII molds, and (3) Dutchland's counterclaim for unpaid invoices unrelated to the SAII. For the reasons below, the Court will grant the motion.

## Background

Four D is a Minnesota corporation in the business of selling molded plastic products to retailers for use in their stores. (Compl. ¶ 2.) Since the fall of 2000, Four D has used Dutchland to manufacture the SAII, a molded plastic unit seating two children that attaches to a shopping cart. (Def.'s App. Tab A (Four D. Dep.) at 5.) Four D is a Minnesota corporation with its principal place of business in Burnsville, Minnesota. (Compl. ¶ 1.) Dutchland is a Wisconsin corporation with its principal place of business in Oostburg, Wisconsin. (Compl. ¶ 3; Ans. ¶ 3.)

In early 2001, Ron Kincaid, a safety manager for Home Depot, began exploring the possibility of placing child carts in Home Depot stores. (Orenstein Aff. Ex. A (Kincaid Dep.) at 19.) Prior to this initiative, Home Depot divisions used child carts inconsistently. (Id. at 17.) "[It] was kind of spotty. I mean, some divisions would use [child carts] and some wouldn't." (Id.) Kincaid's goal was to find a single, uniform child cart for all Home Depot stores. "[W]e were hoping that we were going to be able to identify enough information so that we could find perhaps one cart that would be the standard for all of Home Depot. . . . [Y]ou know . . . it's safe, so this is the cart we want everybody to use." (Id. at 29.)

While at a competitor's store, Kincaid discovered the SAII, a child cart sold by Four D:

> We saw a cart and we saw a couple—a lady using it with kids, and it looked very easy to maneuver in the aisles. So we took the information off the cart and contacted the manufacturer, which was Four D. And started asking questions, do you use them in retail, who do you all supply these carts for, what kind of success have you had, things like that.

(Id. at 18.) To get this information, Kincaid spoke "ten to twenty" times over a two week period to Cindy Little, a salesperson with Four D. (Id. at 21.) Little provided him with packets of information and an attachment called "the Four D way." (Id. at 19.)

Kincaid and Little discussed setting up a pilot project involving SAIIs in Atlanta-area Home Depot stores. Through this pilot, Kincaid hoped to learn:

> [H]ow maneuverable would these carts be in our environment. . . . [O]ur environment is [] hardware. And we had some concern, because of the design of the project with the plastic, whether or not they would hold up. . . .The next thing, from a safety standpoint, we wanted to see would people use them, and would they be safe, would we have accidents with them. You know, those type of things.

(Id. at 27.) Kincaid's role, as he saw it, was limited to the pilot program. "[W]e didn't do anything without running a pilot. So that's what I was doing with this, running a pilot." (Id.)

In the course of Kincaid's conversations with Little, she informed him that Four D's president, Mary Reiland, would be in Atlanta on some business and that Little would "like for her to come by and visit with you." (Id. at 21.) Reiland arrived at the Home Depot corporate offices with a Four D engineer and a sample of the SAII. (Id. at 20.)

While the parties have not fleshed out what happened at this meeting, Reiland apparently left with the impression that Home Depot would "purchase 12,000 [SAIIs] upon successful completion of the test . . . ." (Def.'s App. Tab A at 60.) Kincaid hotly denies this, and asserts that he "would have had no authority to negotiate that or even enter into any—any kind of bartering or negotiation for that, even setting the pricing or things like that. That just wasn't my role." (Orenstein Aff. Ex. A at 37.) Kincaid's lack of authority to purchase the child carts is confirmed by Ken Broome, Home Depot's Store Planning and Purchasing Manager. (See Orenstein Aff. Ex. B (Broome Dep.) at 10-11.)

Upon returning to Minnesota, Reiland summarized her understanding of the Atlanta meeting to Little, who drew up a letter and mailed it to Kincaid:

> We are very excited about the pilot test and survey of the Shop-Along® Child Carrier II . . . Home Depot will be conducting in your Atlanta area stores! . . .
>
> Mary is in the process of building your pricing and to enable her to give you the best price I would like to confirm I have the correct information. These are the details I have given Mary from our conversation:
>
> > Home Depot will be purchasing 12,000 Child Carriers. Delivery of the child carriers will begin after the 30 day test program and be complete within a six-month period. . . .
>
> Ron this is the understanding that we have; if this is incorrect, please let me know in writing immediately as Mary would like to finalize your pricing in the next week.
>
> Based on the above Mary has ordered molds for the Shop-Along II so it is important I have my numbers right!

(Orenstein Aff. Ex. E (Little Letter).) Kincaid testified that he never responded in writing, but orally conveyed to Little that "we weren't at the point where we decided that if, in fact, we were going to purchase these carts, and these were the carts we were going to purchase . . . ." Both Reiland and Little aver that Kincaid said no such thing. (Reiland Aff. ¶ 6; Little Aff. ¶ 3.)

In July 2001, Kincaid placed sample units of the SAII in Home Depot "test store" locations. According to Kincaid, the results were immediate and conclusive. The SAII was defective. "[T]he carts collapsed. . . . We felt very fortunate that nobody was injured using these carts during this period. . . . I mean, since they fell apart that quick, obviously that was not the right cart for us." (Orenstein Aff. Ex. A at 44.) Home Depot cancelled the pilot program and returned the SAIIs to Four D.

Soon thereafter, Four D filed suit against Dutchland, the SAII's manufacturer, alleging breach of warranty and claiming consequential damaged based on the loss of the sale to Home Depot.

**Standard of Decision**

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). It is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). The court views the evidence, as well as all reasonable inferences, in a light most

favorable to the nonmoving party. See Enterprise Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996); see Adkinson v. G.D. Searle & Co., 971 F.2d 132, 134 (8th Cir. 1992). The moving party carries the burden of showing that there is no genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The nonmoving party may not rest upon the allegations or denials of its pleadings. Rather, the nonmovant must establish the existence of specific facts that create a genuine issue for trial. Neither mere allegations nor denials are sufficient. See Liberty Lobby, 477 U.S. at 256.

On summary judgment, the court does not weigh facts or determine the credibility of affidavits and other evidence. See id. at 249. The nonmovant cannot, however, avoid summary judgment by highlighting some alleged factual dispute between the parties. Instead, the disputed fact must be "outcome determinative under prevailing law"; it must be material to an essential element of the specific theory of recovery at issue. See Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992). In essence, the court determines whether there is a need for a trial. Liberty Lobby, 477 U.S. at 250.

## Analysis

Dutchland has moved for partial summary judgment on (1) Four D's claims for lost profits relating to its purported agreement with Home Depot, (2) Four D's claim for its costs in purchasing additional SAII molds to produce the carrier for Home Depot, and (3) Dutchland's counterclaim for certain unpaid invoices relating to transactions apart

from the SAII. For its part, Four D asserts that genuine issues of material fact preclude summary judgment on each of these issues.

**A. Lost Profits**

In order to recover consequential damages under Minnesota law, a plaintiff must prove with reasonable certainty that it is entitled to such damages. See Porous Media Corp. v. Midland Brake, Inc., 220 F.3d 954, 961 (8th Cir. 2000); see also Industrial Graphics, Inc. v. Asahi Corp., 485 F. Supp. 793, 804-05 (D. Minn. 1980) (construing Minnesota U.C.C. and case law). Damages cannot be speculative or conjectural. Henning Nelson Const. v. Fireman's Fund Am. Life Ins., 383 N.W.2d 645, 653 (Minn. 1986). There is no general test for speculative or conjectural damages, and such matters are usually left to the judgment of the trial court. Jackson v. Reiling, 249 N.W.2d 896, 987 (Minn. 1977).

Here, Four D relies on the purported agreement between Kincaid and Reiland to argue that its profits can be proved with a reasonable degree of certainty. Although Reiland and Kincaid disagree about whether the agreement existed, Four D argues that this is a "classic factual dispute" that must, for the purposes of this motion, be resolved in Four D's favor. Conversely, Dutchland argues that, even if Reiland entered into an agreement with Kincaid to sell Home Depot 12,000 SAIIs, the contract would not be binding because Kincaid lacked the actual or apparent authority to agree to such a sale.

It is undisputed that Kincaid did not have the *actual* authority to enter into an

agreement with Four D to purchase 12,000 SAIIs for Home Depot. (See Orenstein Aff. Ex. B at 10-11; Ex. A at 16-17.) Therefore, to establish the sort of binding contract that would allow Four D to prove its profits with a reasonable degree of certainty, Four D must rely on an apparent authority analysis.

In general, a principal is bound not only by an agent's actual authority but also by the authority that the principal has apparently delegated to the agent. Duluth Herald & News Tribune v. Plymouth Optical Co., 176 N.W.2d 522, 555 (Minn. 1970). Apparent authority is authority a principal "holds an agent out as possessing, or knowingly permits an agent to assume." Foley v. Allard, 427 N.W.2d 647, 652 (Minn. 1988.) To find apparent authority, "the principal must have held out the agent as having authority, or must have knowingly permitted the agent to act on its behalf." Hockemeyer v. Pooler, 130 N.W.2d 367, 375 (Minn. 1964); see also Restatement (Second) of Agency § 8 (1958). "[P]roof of the agent's apparent authority must be found in the conduct of the principal, not the agent." Hockemeyer, 130 N.W.2d at 375.

Here, Four D has not presented any evidence that Home Depot cloaked Kincaid with apparent authority. The record is bereft of the sort of "statements, conduct, lack of ordinary care, or other manifestations of the principal's consent" from Home Depot "whereby third persons [would be] justified in believing that the agent [was] acting within his authority." McGee v. Breezy Point Estates, 166 N.W.2d 81, 89 (1969). Kincaid was the only person with whom Four D dealt at Home Depot. While Reiland avers that

"Kincaid led me to believe that this was his project, and that he had the authority to make a commitment on behalf of Home Depot" (Reiland Aff. ¶ 6), apparent authority analysis is based on the conduct of the *principal* rather than the conduct of the agent, see Vacura v. Haar's Equipment, Inc., 364 N.W.2d 387, 391 (Minn. 1985). "No agent by his own act can create evidence of authority." West Concord Conservation Club, Inc. v. Chilson, 306 N.W. 2d 893, 897 (Minn. 1981).

The only evidence that Four D advances to assign Home Depot responsibility for Kincaid's action is his title as corporate safety manager and his role in charge of the pilot project. "[A]pparent authority can be created by appointing a person to a position, such as that of *manager* or treasurer, which carries with it generally recognized duties . . . ." Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 458 (Minn. Ct. App. 2001) (quoting Restatement (Second) of Agency § 27 cmt. a) (emphasis added). However, "an agent's position alone is not sufficient evidence of apparent authority to bind the corporation to obligations incurred by that agent." Id. Unlike Powell, on which Four D greatly relies, Kincaid was hardly Home Depot's "top-ranking executive." Id. at 459. Instead, he was Home Depot's corporate safety manager, a title that conveys no "generally recognized duties," id. at 458, and only implies powers relating to corporate safety. Likewise, there is no evidence to indicate that Home Depot placed Kincaid in charge of purchasing anything more than child carts for the pilot project. Accordingly, the Court concludes Home Depot did not cloak Kincaid with apparent authority.

Even if Kincaid had the authority to bind Home Depot, the Court could not infer a contract based on the evidence before it. Four D asserts (1) an oral contract arose from Kincaid's meeting with Reiland, (2) that was confirmed through Little's letter to Kincaid in accord with Minn. Stat. § 336.2-201(2), and (3) that does not fail for lack of a price term under Minn. Stat. § 336.2-305. The Court, however, can find neither the intent nor the definiteness required to establish a contract under Minnesota law. "Intent to contract cannot be supplied as an afterthought." Johnson v. Blue Cross and Blue Shield of Minn., 329 N.W.2d 49, 51(Minn. 1983). The record here contains no facts by which the Court could infer such an intent by Kincaid on behalf of Home Depot. Rather, the record is replete with evidence that Kincaid neither had the interest nor the authority to consummate a deal beyond the scope of the pilot project. Likewise, the "confirmation" letter— which indicates only that Four D is in the process of "building your pricing" and is so vague that it does not even specify from *whom* Home Depot would be purchasing its child carriers (see Orenstein Aff. Ex. E)— would be "[in]sufficient against the sender" and therefore fails to comply with Minn. Stat. § 336.2-201(2). Cf. Marvin Lumber and Cedar Co. v. Johnson, 733 F. Supp. 1302 (D. Minn. 1990) (Devitt, J.) (noting that a confirmation must "evidence a contract" to be sufficient against the sender); see also Minn. Stat. § 336.2-201, subd. 1. Lacking intent or definiteness, the Court concludes that no contract arose between the parties.

As a final measure of the ephemeral nature of Four D's consequential damages,

even *if* Four D could prove that Kincaid had apparent authority, and *if* it could demonstrate the existence of a contract, Four D's lost profits would still be highly speculative. A contract subject to the successful completion of the pilot program would be contingent upon a number of factors unrelated to Dutchland's purported breach, including (1) "how maneuverable . . . these carts would be in [Home Depot's] environment," (2) "whether or not [the plastic] would hold up" in a hardware store, (3) "would people use them," and (4) "would they be safe." (Orenstein Aff. Ex. A at 28.) While Four D makes much of the fact the SAII was the only cart involved in the pilot project, the record indicates that other carts were not involved only because they were well-understood by the Home Depot divisions that used them. (See id. at 28 (stating that competing carts were not involved in the pilot because "other divisions had tested other carts . . . . [a]nd they were pretty comfortable with how these carts would perform").) Thus, even in the absence of Dutchland's alleged breach, the SAII would have had to outperform its competitors in terms of maneuverability, utility, durability, and safety.

The seemingly endless chain of inferences required to determine Four D's lost profits demonstrates the speculative and conjectural nature of its claim for consequential damages. Accordingly, the Court concludes that Dutchland is entitled to partial summary judgment on this claim.

### B. Out-of-Pocket Costs

Dutchland has also moved for summary judgment on Four D's claim for out-of-pocket costs relating to the purchase of additional SAII molds. By all appearances, Four D decided to purchase the molds well before the beginning of the pilot program. In the May 16, 2001 confirmation letter, Little wrote, "Based on the above Mary [Reiland] *has ordered* molds for the Shop Along ® II so it is important that I get my numbers right!" (Orenstein Aff. Ex. E (emphasis added).) Whether the decision to order new molds with a substantial condition precedent outstanding represented a calculated risk on the part of Four D, it is hard to tell. Regardless, Dutchland can hardly be said to be responsible for molds purchased pursuant to an agreement under which Home Depot could terminate for a number of reasons unrelated to Dutchland's manufacturing defect. Four D's loss is not causally linked to Dutchland's purported breach and summary judgment is therefore appropriate on Four D's claim for the out-of-pocket costs of the additional molds.

### C. Payment of Invoices

Finally, Dutchland argues it is also entitled to summary judgment on its counterclaim for payment of invoices unrelated to the SAII. As Dutchland asserts, "Four D has never complained of the quality of the [these] products . . . . It has simply refused to pay for them." (Def.'s Mot. Supp. Summ. J. at 23.) In response, Four D argues Dutchland is seeking judgment on only a portion of its claim, which Rule 56 forbids.

Summary judgment may be had to one claim among many, but not as to one

portion of a claim. Ott v. Target Corp., 153 F. Supp. 2d 1055, 1077 (D. Minn. 2001) (Magnuson, J.) (citing Kendall McGaw Labs, Inc. v. Cmty. Mem'l Hosp., 125 F.R.D. 420, 421 (D.N.J. 1989)); New Jersey Auto. Ins. Plan v. Sciarra, 103 F. Supp. 2d 388, 396 (D.N.J. 1998) ("Nothing in [Rule 56] can be read to allow partial summary judgment on only one portion of a claim."); Grabill Corp. v. NCNB National Bank of North Carolina, 135 B.R. 101, 106 (Bankr. N.D. Ill. 1991) ("Partial summary judgment is available only to dispose of one or more counts of the complaint in their entirety"); 10B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2736 (3d ed. 1998) (listing instances of the appropriate use of partial summary judgment).

Dutchland asserts that its claim for unpaid invoices is, in fact, one claim. Claims are normally treated as separable if they involve at least some different questions of fact and law and could be separately enforced, see Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 21 (2d Cir. 1997), or if "different sorts of relief" are sought, see Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 580-81 & n.18 (1980); see also 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2657 (2d ed. 1983) (claims are separable when there is more than one possible recovery and the recoveries are not mutually exclusive).

Here, the unpaid invoices for items unrelated to the SAII constitute a separate claim in that they (1) involve products unrelated to Dutchland's purported breach, and (2) could have been separately enforced. In fact, all of these unpaid invoices appear to

involve transactions that either were originally brought in a separate lawsuit or relate to products produced for Four D by Dutchland after this litigation commenced. Because Four D does not dispute that it owes Dutchland this money, and its procedural argument is wanting, summary judgment is appropriate.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1. Defendant Dutchland Plastics Corp.'s Motion for Partial Summary Judgment (Doc. No. 66) is **GRANTED**;

2. Plaintiff Four D, Inc.'s claim for lost profits is **DISMISSED WITH PREJUDICE**;

3. Plaintiff Four D, Inc.'s claim for out-of-pocket damages relating to the purchase of new molds for the Shop-Along Child Carrier II is **DISMISSED WITH PREJUDICE**;

4. Defendant Dutchland Plastics Corp. is entitled to damages of $669,281.32 on its Counterclaim for payment of invoices unrelated to the SAII.

Dated: April 8, 2003

RICHARD H. KYLE
United States District Judge